*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* W HEFRON, Minor.

UNPUBLISHED
March 11, 2026
11:57 AM

No. 377713
Calhoun Circuit Court
Family Division
LC No. 2023-000171-NA

Before: KOROBKIN, P.J., and YATES and FEENEY, JJ.

PER CURIAM.

Respondent-mother appeals of right the trial court's order terminating her parental rights to her minor child, WH, pursuant to MCL 712A.19b(3)(c)(*i*) (failure to rectify conditions that led to the adjudication), (3)(c)(*ii*) (failure to rectify other conditions), and (3)(j) (reasonable likelihood that the child will be harmed if returned). We affirm.

## I. FACTUAL BACKGROUND

In December 2022, three days after respondent-mother gave birth to WH, the Department of Health and Human Services (DHHS) received a complaint stating concerns about respondent-mother's ability and willingness to care for WH.[1] According to that complaint, respondent-mother expressed suicidal ideations and a desire to engage in self-harm in the hospital, and she struggled to bond with WH, who was diagnosed with Down Syndrome. Respondent-mother denied or was minimally engaged in support services that were offered to her. As Children's Protective Services (CPS) workers investigated the initial complaint, they received additional complaints from doctors and service providers that WH may not be getting the nutrition that he needed because respondent-mother did not understand how to feed WH and did not keep him on a regular feeding schedule.

In January 2023, the DHHS petitioned to remove WH from respondent-mother's care. The petition alleged that respondent-mother had autism spectrum disorder (ASD), that she neglected

---

[1] WH's father was a respondent in this case, and his parental rights to WH were terminated on the same date as respondent-mother's rights, but he is not a party to this appeal.

-1-

WH after his birth by not feeding him properly and refusing to engage in support services and medical appointments, that she did not follow the safety plan developed with CPS, and that she may be suffering from postpartum depression and was unable to bond with WH. The trial court issued an emergency ex parte order to take WH into protective custody. When a CPS worker went to respondent-mother's home to remove WH from her care, respondent-mother threw WH at her as if he were a ball. The CPS worker caught WH, and he did not sustain any injuries. That incident led to respondent-mother's parenting time being suspended pending the results of a psychological evaluation.

Dr. Randall Haugen conducted respondent-mother's psychological evaluation in February 2023. He found that respondent-mother had ASD, which caused difficulties with processing and retaining information, especially verbal communications.[2] Dr. Haugen observed that respondent-mother's emotions and behavior were exacerbated by postpartum issues, but he explained that they were also characteristic of her intellectual deficits. Respondent-mother was at risk for patterns of abuse and neglect, easily irritable and overreactive, prone to being self-preoccupied or preoccupied with intimate relationships instead of WH, and had a poor attachment to WH because of his Down Syndrome diagnosis. Significantly, the evaluation stated that respondent-mother should not be left unsupervised with children under 17 years of age.

At a pretrial conference in March 2023, respondent-mother pleaded to several allegations set forth in the petition, so the trial court exercised jurisdiction on that basis. WH was placed with his paternal grandparents, who voiced a willingness to adopt him if respondent-mother's parental rights were terminated. Because of WH's significant medical needs and his developmental delays associated with Down Syndrome, WH attended four to six appointments each week. Respondent-mother's attendance at those appointments was, at best, sporadic until shortly before termination.

Later in 2023, respondent-mother started a romantic relationship with Benjamin Hopkins, and she lived with him for a short time. She became pregnant and gave birth to her second child, MH, in March 2024. Hopkins and respondent-mother eventually broke up, so respondent-mother moved in with her father and stepmother in South Lyon, where she kept appropriate furniture and supplies for WH and MH. Hopkins was given full custody of MH in unrelated court proceedings. A court order stated that respondent-mother's visitation with MH must be supervised, and Hopkins had discretion to select the supervisor. Hopkins at first permitted respondent-mother's stepmother to supervise visitation, but he suspended all visitation with MH after he found out that respondent-mother violated the order by caring for MH without her stepmother present.

During WH's case, respondent-mother finished three online parenting classes and an online anger-management class. She successfully discharged from her counseling program in December 2024. In January 2025, the DHHS modified respondent-mother's parenting time with WH to allow parenting time to occur in her home in South Lyon, instead of at a library near WH's placement. Parenting time was also converted to unsupervised visits and doubled from two hours twice a week

---

[2] Respondent-mother sought accommodations under the Americans with Disabilities Act (ADA), 42 USC 12101 *et seq.*, and our Supreme Court's decision in *In re Hicks/Brown*, 500 Mich 79, 86; 893 NW2d 637 (2017). On appeal, respondent-mother does not challenge the sufficiency of the accommodations that she received.

to four hours twice a week. Those changes resolved respondent-mother's transportation issues for parenting time and gave her the opportunity to care for WH and MH in a more natural setting. But WH's grandparents soon began to complain that WH experienced night terrors on the days that he took part in parenting time. They learned from WH's pediatrician that the night terrors were likely caused by stress and lack of sleep. But the trial court refused to find a causal connection between WH's night terrors and respondent-mother's parenting time because the night terrors could also be caused by the stress of WH's busy schedule and the long car rides on the days that required a trip to respondent-mother's home for parenting time.

In January 2025, the DHHS asked respondent-mother to return to counseling after she was criminally charged with stealing from a Walmart store. Respondent-mother eventually attended a few appointments, but she was inconsistent with her appointments for medication review. Despite attending personal counseling and completing an anger-management class, respondent-mother still had aggressive and counterproductive reactions to stressful situations. Respondent-mother argued with her caseworker, coworkers, and Hopkins, and she did not work well with WH's grandparents. She exhibited poor courtroom etiquette, screaming at her screen during virtual court hearings while her microphone was muted and texting derogatory messages to witnesses about their testimony.

By the time the termination hearing began in April 2025, respondent-mother had improved her financial situation. She had obtained stable employment and transportation, and she lived with her father and stepmother in a suitable home. But respondent-mother's violent, impulsive behavior was still largely unresolved, so the trial court did not believe that she benefited from the services offered to her. After considering all the evidence presented, the trial court found that the conditions that led to adjudication, as well as other conditions, continued to exist and would not be rectified within a reasonable time given that WH was by then $2\frac{1}{2}$ years old and had spent nearly his entire life in foster care. The trial court also found that respondent-mother's violent tendencies created a reasonable likelihood that WH would be harmed if he were returned to respondent-mother's care. After identifying those statutory grounds for termination of respondent-mother's parental rights, the trial court found that termination was in the best interests of WH because he had spent nearly his entire life in a pre-adoptive foster home with a strong bond to his grandparents, who took care of WH's special needs. Also, the trial court reasoned that a guardianship would not be appropriate because respondent-mother was hostile and did not work well with WH's paternal grandparents. Accordingly, the trial court terminated respondent-mother's parental rights to WH in August 2025. This appeal followed.

## II. LEGAL ANALYSIS

On appeal, respondent-mother argues that the trial court's "factual findings on the statutory factors" and its "decision to terminate [her] parental rights are clearly erroneous." A trial court is justified in terminating a parent's rights to a child only if the court finds "by clear and convincing evidence that at least one of the statutory grounds for termination in MCL 712A.19b(3) has been met." *In re Sanborn*, 337 Mich App 252, 272; 976 NW2d 44 (2021) (quotation marks and citation omitted). "We review the trial court's determination of statutory grounds for clear error." *Id*. "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re Kellogg*, 331 Mich App 249, 253; 952 NW2d 544 (2020) (quotation marks and citations omitted).

Here, the trial court decided that statutory grounds for termination of respondent-mother's parental rights to WH existed under MCL 712A.19b(3)(j) because respondent-mother's history of violent outbursts and derogatory comments regarding WH's condition would likely result in harm to him if he were returned to her care. According to MCL 712A.19b(3)(j):

> (3) The court may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence, 1 or more of the following:

> \* \* \*

> (j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if the child is returned to the home of the parent.

"Harm" includes both emotional harm and physical harm. *In re Sanborn*, 337 Mich App at 279. A respondent's failure to control her anger even after taking anger-management classes is evidence that her child would be harmed if returned to her home. *In re Olive/Metts*, 297 Mich App 35, 41; 823 NW2d 144 (2012). In contrast, a criminal history including minor offenses with no evidence of a likelihood of reoffending does not justify termination. *In re Mason*, 486 Mich 142, 165; 782 NW2d 747 (2010).

Here, the trial court described respondent-mother as "actually violent." Hopkins testified that she hit him several times when they were dating, and her conduct required police intervention. She broke a TV during one argument. She threw cheese during an argument with her coworkers at the pizza restaurant where she worked. And she posted on social media that MH's grandmother was "about to get her ass beat" after the grandmother testified in these proceedings. Unfortunately, respondent-mother did not draw the line at displaying violent behavior around her children. She threw her phone in MH's direction because she was upset that MH was crying. She took an anger-management class, but she described it as a "joke," telling Hopkins that she would beat her children and that she was "fine how she is." Such behavior reflects a recurring pattern of violence that did not improve by participating in services offered by the DHHS. Her communications with Hopkins suggest that respondent-mother understood that she presented a risk of harm to her children.

The risk of physical harm to WH is sufficient to affirm the trial court's finding of a statutory ground for termination, but the trial court's termination of respondent-mother's parental rights also protected WH from emotional harm he would have endured if he had been returned to respondent-mother's care. Respondent-mother struggled to accept and embrace WH's Down Syndrome at the time of termination. She called him ugly and "retarded," and she was afraid of people staring and judging her in public. She also made comments to Hopkins and her caseworker that she was giving up on WH and did not care if he was taken from her. Those recurring remarks reveal that, even if respondent-mother loved WH, she could not accept his Down Syndrome conditions. Growing up with a mother who is embarrassed to be seen with him and makes derogatory comments about his disability would take an emotional toll on WH, especially when he is old enough to understand the nuances of his relationship with respondent-mother. Because of the likely impact of reunification on WH's physical and mental health, we conclude that the trial court did not clearly err by finding that a statutory ground for termination existed under MCL 712A.19b(3)(j).

Based on our conclusion that the trial court did not commit clear error by finding a ground for termination of parental rights under MCL 712A.19b(3)(j), we need not address the contentions of respondent-mother that the trial court clearly erred in finding additional grounds for termination of parental rights under MCL 712A.19b(3)(c)(*i*) and (3)(c)(*ii*).  See *In re Sanborn*, 337 Mich App at 275-276 n 5.  Finally, although respondent-mother has not challenged on appeal the trial court's finding that termination of respondent-mother's parental rights was in the best interests of WH, a careful review of the record reveals that the trial court did not commit clear error in its finding on the best interests of WH.[3]

Affirmed.

/s/ Daniel S. Korobkin
/s/ Christopher P. Yates
/s/ Kathleen A. Feeney

---

[3] As the trial court explained in considering best interests, WH has special needs, he "has spent his entire life in foster care" with his paternal grandparents in a pre-adoptive home and he is "clearly bonded to his grandparents," and when respondent-mother's "parenting time is limited or reduced, the child actually does better."